IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| MORGAN POWELL, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>IDACORP, INC., et al.,<br><br>Defendants. | CASE NO. CV-04-249-S-EJL* (lead case)<br>(Consolidated with Case No. CV-04-322-S-EJL)<br><br>**REPORT AND RECOMMENDATION** |

Currently pending before the Court for its consideration is Defendants' motion to dismiss (docket # 56), filed February 9, 2005. Having reviewed all briefing submitted, as well as other pertinent documents in the Court's file, and having heard oral arguments, the Court makes its Report and Recommendation as follows.

## REPORT
### I.
### Background.

This is a class action suit on behalf of persons who acquired publicly issued securities of Idacorp, Inc. between February 1, 2002, and June 4, 2002 ("class period"). Plaintiffs allege that the Defendants violated federal securities laws through improper energy trading activities,

**Report and Recommendation - Page 1**

manipulation of earnings, and the issuance of false and misleading financial forecasts.  As a result, Plaintiffs allegedly purchased Idacorp, Inc., securities at artificially inflated prices during the class period.

The Defendant, Idacorp, Inc., ("Idacorp") is described as an energy holding company which operates through seven subsidiaries, two of which are involved here:  Idaho Power Company and Idacorp Energy.  Idaho Power Company ("IPC") is strictly a regulated electric public utility company that generates, transmits, distributes, sells and purchases electric energy for its customers.  Idacorp Energy ("IE") was an unregulated company that engaged in energy trading, hedging, and marketing of electricity and natural gas.

In 2001, Idacorp was listed as a Fortune 500 company with $5.6 billion in revenue.  It was among the top five power marketers in the West and was among the top twenty in the nation, mainly due to IE's success, which accounted for over $4 billion of the 2001 revenue.  (IE had been a major player in selling power to California during its energy crisis that year.)  At its height, Idacorp stock sold at $40 per share.  In addition to Idacorp, the other named Defendants are:  John Miller (Idacorp's Chairman of the Board), Jan Packwood (Idacorp's President and CEO and IPC's CEO), J. Lamont Keen (Idacorp's Executive Vice President and IPC's President and Chief Operating Officer), and Darrel Anderson (Idacorp's Vice President of Finance and Treasurer and Chief Financial Officer).

Plaintiffs generally allege that, during the class period, IE manipulated earnings and financial forecasts in order to maintain a false perception of continued growth.  Plaintiffs allege the Defendants knew that public announcements that they were making about earnings potential were false and that the Plaintiffs relied on this information to their detriment.

**Report and Recommendation - Page 2**

The first public announcement occurred on February 1, 2002. Idacorp reported record financial earning for 2001, which were attributed to IE trades. Idacorp projected that earnings per share ("EPS") on its stock for 2002, of $2.90 to $3.20. Stock analysts then projected that IE would contribute EPS of $1.59 for 2002. Plaintiffs allege that the Defendants knew at the time the announcement was made that the earnings results and forecasts were materially false and misleading and that the predicted future earnings potential was inflated.

A second public announcement was made by Idacorp on April 12, 2002, and the 2002 EPS amount was reduced to the range of $2.20 to $2.50 per share. Stock analysts also projected that IE would contribute lower EPS of $0.92 for 2002. Plaintiffs allege this announcement was necessary due to the government agencies' scrutiny and that Idacorp knew that it would be unable to continue to manipulate projected earnings for 2002.

On May 22, 2002, Idacorp announced that it had been requested to turn over documents to the Federal Energy Regulatory Commission ("FERC"). Then on May 30, 2002, the state of California brought suit against IPC for price gouging after it allegedly sold power to California at inflated prices during its 2001 energy crisis.

A third public announcement about earnings potential was made by Idacorp on June 4, 2002. The 2002 EPS projection was further reduced to the range of $1.35 to $1.70 per share and it was announced that it was expected that no revenue would be generated by IE in 2002 and perhaps even a loss of $0.25 per share was expected. (The actual loss based on IE's performance ended up being $0.39 per share.) On June 21, 2002, Idacorp announced that it was discontinuing IE's operations. By then, Idacorp's stock price had dropped to $27 per share.

Eventually, the governmental agency investigations revealed improprieties in IE trading practices; that IPC and IE had engaged in collusive conduct which conferred improper benefits on IE at the expense of IPC customers; that various provisions of the Federal Power Act, 16 U.S.C. § 824, *et seq.* (governing sales of wholesale electricity), were violated; and that the Company's own code of conduct was violated. Idacorp, IE, and IPC entered into settlement agreements with both FERC (on May 16, 2003), and IPUC (on March 15, 2004), which resulted in millions of dollars being refunded to IPC customers from both IPC and IE.

Plaintiffs now bring a class action alleging two causes of action: violation of Section 10(b) of the 1934 Securities Exchange Act and Rule 10b-5, 17 C.F.R. § 240.10b-5; and violation of Section 20(a) of the 1934 Securities Exchange Act.

## II.
## Standard of review.

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) should not be granted unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). When attacked pursuant to Rule 12(b)(6), well-pled allegations in a complaint must be treated as true, and all reasonable inferences drawn in the plaintiff's favor. *See North Star Int'l v. Arizona Corp. Comm'n*, 720 F.2d 578, 580 (9th Cir. 1983). Conclusory allegations of law and unwarranted inferences, however, are insufficient to defeat a motion to dismiss. *In re VeriFone Sec. Litig.*, 11 F.3d 865, 868 (9th Cir. 1993). When ruling on a motion to dismiss, the district court may consider the facts alleged in the complaint, documents attached to the complaint, documents relied upon but not attached to the complaint when authenticity is not contested, and matters of

which the Court takes judicial notice. *Parrino v. FHP, Inc.*, 146 F.3d 699, 705-06 (9th Cir. 1998).

In considering the Private Securities Litigation Reform Act ("PSLRA"), the court must employ a heightened standard of review. In 1995, Congress enacted the PSLRA to curb what were perceived as abusive practices in securities-fraud litigation. In raising the bar for securities-fraud suits, the PSLRA toughened the already-stringent requirements for pleading fraud under FRCP 9(b). *In re GlenFed, Inc., Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir.1994). Under the PSLRA, to adequately allege securities fraud, a complaint must specify each statement alleged to have been misleading, the reason or reasons why the statement was misleading, and, if an allegation is made on information and belief, all facts upon which that belief is formed. 15 U.S.C. § 78u-4(b)(1). A complaint must also state with particularity facts giving rise to a "strong inference" that the defendant(s) acted with the required state of mind. 15 U.S.C. § 78u-4(b)(2).

## III.
## Analysis of Motion to Dismiss.

Defendants filed a motion under Fed. R. Civ. P. 12(b)(6) requesting that the Court dismiss the consolidated complaint because it fails to state a claim upon which relief can be granted. The motion to dismiss is grounded in a number of assertions, any of which, if found to be true, would allow the motion to be granted and this case to be dismissed:  1) the consolidated complaint  was not filed within the proscribed statute of limitations and it does not "relate back" to the original complaint; 2) the claims do not properly plead material falsity of Defendants' statements; 3) Defendants' statements were forward-looking and provided meaningful cautionary language so as to be protected under the "safe harbor" provisions of the PSLRA; 4) Plaintiffs failed to plead that Defendants had the requisite scienter, or the knowledge as to the falsity of

**Report and Recommendation - Page 5**

their statements at the time the statements were made, and; 5) there is not a sufficient causal connection between the alleged misrepresentations and Plaintiffs' economic loss.

**A.      Plaintiffs' Consolidated Complaint Relates Back to the Original Complaint**.

A claim for securities fraud must be brought within two years after the discovery of the violation. 28 U.S.C. § 1658.  Here, Plaintiff Morgan Powell filed the original complaint on May 26, 2004 (docket # 1).[1]  On June 22, 2004, Plaintiff Shorthouse filed a similar class action suit which was consolidated with the Powell class action on August 31, 2004, and Robert Keil was appointed lead Plaintiff pursuant to the PSLRA. On October 29, 2004, an amended complaint, entitled "consolidated complaint," was filed (docket # 30).   Although Defendants argue that the consolidated complaint lies outside the statute of limitations, codified in 28 U.S.C. § 1658, "An amendment of a pleading relates back to the date of the original pleading when...[it] arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading."  Fed. R. Civ. P. 15(c).  In this case, the consolidated complaint clearly arises from the same "conduct, transaction or occurrence" set forth in the original complaint because Plaintiffs pleaded that, during the same four month class period now at issue in the consolidated complaint, the same five Defendants violated §10(b) and Rule 10b-5.

Defendants' argument that the gravamen of the case was not developed until the filing of the consolidated complaint is not convincing.  Plaintiffs alleged in the original complaint the same various wrong doings that are augmented and clarified, and therefore realleged, in the consolidated complaint.  The following excerpt from the original complaint demonstrates some of the broad allegations:

---

[1]      For the purpose of this motion to dismiss, Defendants concede that the original complaint was timely.

**Report and Recommendation - Page 6**

> Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Idacorp common stock by *disseminating materially false and misleading statements and/or concealing material adverse facts*. The scheme: (1) deceived the investing public regarding Idacorp's business, operations, management, and the intrinsic value of Idacorp's common stock; and (2) caused Plaintiff and other members to the Class to purchase Idacorp's common stock at artificially inflated prices.

(Original complaint, docket # 1, at ¶ 18, emphasis added.)

Defendants cite *Percy v. San Francisco Gen. Hosp.*, 841 F.2d 975 (9th Cir. 1988), in an attempt to sway the Court that they were not on notice and not able to "take steps to preserve evidence." In that case, the court denied the filing of an amended complaint because an additional claim in the new pleading arose out of a Civil Service Commission hearing which was a separate transaction or occurrence from the allegations in the initial complaint. *Id.* at 979. The court reasoned that the additional claim based on the commission hearing did not sufficiently put the defendants on notice and did not allow them to "take steps to preserve evidence." *Id.*

In contrast, Plaintiffs in the present case plead the same violations, by the same Defendants, in the same class period, based on many of the same public announcements. It is clear that Defendants were on notice of the factual events giving rise to the assertions in the original complaint. Under these circumstances, Defendants are not prejudiced if another claim, arising out of the same facts, is added to the claims already pending before the Court. *Santana v. Holiday Inns, Inc.*, 686 F.2d 736, 740 (9th Cir. 1982).

Here, the consolidated complaint relates back because the claims are based on, "*disseminating materially false and misleading statements and/or concealing material adverse facts.*" Fed. R. Civ. P. 15(c). The Court finds that the consolidated complaint does properly relate back under Fed. R. Civ. P. 15(c) because the claims arise out of the same conduct,

**Report and Recommendation - Page 7**

transaction, or occurrence as the allegations contained in the original complaint. Therefore, the Court recommends that motion to dismiss on this ground be denied.

**B.     Arguments for dismissal based on case law and the PSLRA.**

The Defendants advance several arguments why the motion to dismiss should be granted relying on provisions of the PSLRA and case law analyzing security litigation. As the Supreme Court has stated:

> In cases involving publicly traded securities and purchases or sales in public securities markets, the action's basic elements include:
> (1)   *a material misrepresentation (or omission)*;
> (2)   *scienter, i.e.* a wrongful state of mind;
> (3)   *a connection with the purchase or sale of a security*;
>
> (4)   *reliance,* often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation," (nonconclusively presuming that the price of a publicly traded share reflects a material misrepresentation and that plaintiffs have relied upon that misrepresentation as long as they would not have bought the share in its absence);
> (5)   *economic loss*; and
> (6)   *"loss causation" i.e.,* a causal connection between the material misrepresentation and the loss.

*Dura Pharmaceuticals, Inc., v. Broudo,* 544 U.S. ____, 125 S. Ct. 1627, 1631, ___L.Ed.2d___ (2005)(emphasis supplied) (internal citations omitted).

The Defendants have argued for dismissal based on most of the above grounds. Following oral argument, the Court requested counsel submitted additional briefing on what impact the Supreme Court's decision in *Dura,* decided on April 19, 2005, might have on the pending motion. Because this is such a recent case, and has many parallels to the allegations made by Plaintiffs in this case, the Court finds it is appropriate to start with a discussion of *Dura*

and why a unanimous Supreme Court determine that prior Ninth Circuit law on the question of loss causation was incorrect.

In part A of the opinion, the Supreme Court first discussed what a private plaintiff must *prove* in a security fraud cases, one element being that the defendant's fraud caused an economic loss. In fact this is codified in 15 U.S.C. § 78u-4(b)(4). Previously the Ninth Circuit held that this requirement could be satisfied by simply establishing that the "price" of the security on the date of the purchase was inflated because of a misrepresentation or omission. *Broudo v. Dura Pharmaceuticals, Inc.*, 339 F.3d 933, 938 (9th Cir. 2003).

Dura's stock was traded on the market and the plaintiffs had purchased their stock between April 15, 1997, and February 24, 1998. The plaintiffs alleged that before and during the class period, Dura made false statements concerning both Dura's future drug profits and future Food and Drug Administration approval of a new asthmatic spray device. On the last day of the class period, Dura announced lower than expected earning, principally due to slow drug sales and the next day the shares lost almost one-half of their value. Several months later the asthmatic spray device was denied approval by the FDA. The Dura plaintiffs claimed they had paid artificially inflated prices for the securities based on these misrepresentations.

In paragraphs 3-7 of the consolidated complaint, Plaintiffs allege that through the activities of IE, by manipulating its earning and financial forecasts and engaging in improper trades, that Idacorp's stock had a "rapid assent in 2000-2001" and based on Idacorp's stellar 2001 financial results and positive earning guidance for 2002, Idacorp stock traded as high as $40 per share. The bottom line, according to the Plaintiffs, is that Idacorp's stock was overinflated at the time Plaintiffs purchased his stock based on misrepresentation made about IE

**Report and Recommendation - Page 9**

past and future performance, as opposed to what its true value would have been but for the illegal activities, and that they suffered damages due to the loss in stock value.

The Ninth Circuit held it was sufficient proof to establish loss causation, if at the end of the day, the price paid for the stock was inflated because of misrepresentation. The Supreme Court stated that in its view, in fraud-on-the-market cases, an inflated purchase price will not itself constitute or proximately cause the relevant economic loss. Even if the misrepresentations are revealed to the public while the stock is being held, it might mean, on one hand, that the lower price the stock would now bring was result of the misrepresentation now being made public, but on the other hand, this "is far from inevitably so." *Dura*, 125 S. Ct. at 1632. As the Supreme Court noted, "[t]hat lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions or other events, which taken separately or together account for some or all of that lower price." *Id.*

Returning to the facts of this case, even Plaintiffs' consolidated complaint describes many economic circumstances and industry-specific events that preceded and occurred during the class period. Prior to the class period, the price of energy had reached unprecedented highs. The deregulation of energy markets, combined with illegal energy trading manipulations by companies such as Enron, created an environment of widespread volatility and corruption. (*See* consolidated complaint, docket # 30, at para 3) At the start of class period, Idacorp issued a press release which reported strong 2001 earning boosted by energy market results. As to IE, the strong performance was driven by structured origination activities, continued price volatility, and increased volume of transactions. The annual volume of settled power sales in 2001 increased

**Report and Recommendation - Page 10**

48% over the previous year. Setting aside for the moment the alleged misrepresentations and omissions, if any of the above market factors change during the time a shareholder holds shares, then logically there might be a reduction in the value of the stock.

The February 1, 2001, press release invited all interested parties to listen to an analyst conference call to be held later that day and that a replay of the call was available on Idacorp's web site. During the conference call, several factors were mentioned that might positively or negatively impact the value of the stock. For instance, as disclosed in the December 4, 2001, 8K filing, a suit had been filed against Overton Power District for failure to meet payments and a $73 million long term asset was on the books that might have to be adjusted depending on the outcome of the litigation. Analysts also discussed looking at market conditions for 2002, where lower prices and decreased volatility was expected to impact the business and deteriorating credit conditions would be expected to limit the ability to transact with many counterparties. Forward looking, Idacorp re-affirmed its earning guidance for 2002 in the range of $2.90 to $3.20 per share. The conference call concluded with comments by Defendant Packwood, who stated that in his 32 years in the business, he could not recall one where Idacorp faced more variables and more uncertainty that could impact the business, both positively and negatively. Factors included that the market demand was "soft" and the California energy crisis and Enron debacle had created significant legislative and regulatory overhang. Also, in Idacorp's view, an "activist FERC" has the industry on notice to expect rulemaking on market design, market power, affiliated transactions, and revenue subject to refund. (Declaration of Dennis Kerrigan, Jr., docket # 68, exhibit 5, Tab D - transcript.) Following the press release and conference call

**Report and Recommendation - Page 11**

the purchasing public was aware of other factors operating in the market place that might in future affect the price of the stock.

With this back drop, we can return to the Supreme Court's decision in *Dura*. The Supreme Court noted the objective of the securities law:

> The securities statutes seek to maintain public confidence in the marketplace. . . . They do so by deterring fraud, in part through the availability of private securities fraud actions. . . . But the statutes make these latter actions available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause. . . . ('[A]llowing recovery in the face of affirmative evidence of nonreliance–would effectively convert Rule 10b-5 into a scheme of investor's insurance. There is no support in the Securities Exchange Act, the Rule, or our cases for such a result. ')

*Id.* at 1633 (internal citations omitted). The PSLRA also expressly imposes on the Plaintiffs the burden of proving that the Defendants' alleged misrepresentations "caused the loss for which the plaintiff seeks to recover." 15 U.S.C. § 78u-4(b)(4). In sum, the Plaintiffs must prove that the Defendants' misrepresentations (or other fraudulent conduct) proximately caused the Plaintiffs' economic loss.

Part B of the *Dura* decision looked to determine if the complaint adequately *alleged* the necessary proximate causation and economic loss. The Supreme Court found in *Dura* that the complaint failed to allege that the stock prices fell after the truth became known and there was no causal connection between the loss and the misrepresentation. We have reached this stage in this case: have the Plaintiffs adequately alleged facts in the complaint that support the loss causation? *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005) (upholding dismissal because plaintiffs "offer no factual basis to support the allegation that [defendant's] misrepresentations and omissions caused the losses").

**Report and Recommendation - Page 12**

The class period ended on June 4, 2002, when Idacorp announced that it was lowering its financial guidance for 2002. The guidance lowered the earnings per share over 30% and stated the IE would be unable to generate income, and Idacorp shares may suffer up to 25-cents per share loss due to IE's business operations. The report blamed the reduced earnings on a stagnant wholesale energy market and lower volatility and reduced pricing spreads in the Western wholesale energy market. Also noted were increasing regulatory uncertainty and deterioration of credit-worthy counterparties. There had been an earlier press releases on April 12, 2002 which projected reduced earning per share for Idacorp for the coming year.

Plaintiffs argue that the economic loss occurred when Idacorp "could no longer engage in the manipulative transactions which caused the artificial inflation to be removed from the stock price." Also, Plaintiffs allege the price declined when Idacorp disclosed the lack of creditworthy counterparties, something Plaintiffs allege Idacorp previously concealed. (*See* Plaintiffs' supplemental brief, docket # 81, at 5, addressing *Dura Pharms. Inc. v. Broudo*, 125 S.Ct. 1627.)

Before discussing the specific allegations supporting loss causation, the Court will review what information was available to the investing public about the misrepresentations and fraudulent activity that Plaintiffs assert was going on behind the scene at IPC and IE. In their consolidated complaint, Plaintiffs' refer to the settlements reached with the IPUC and FERC, but the orders, settlements, and disclosures of improper trading activities were not reached until February and May, 2003, and March, 2004. In May, 2002, the matters were in their infancy, and documents were only just being sent by Idacorp to the regulators. In any event, Plaintiffs do not allege that these very initial inquiries caused the stock to drop, which would be difficult to do

**Report and Recommendation - Page 13**

because a full disclosure of the improper trading activities that the regulators took issue with did not occur until months or years after the end of the class period. As *Dura* would find, these investigations were not the proximate cause of the economic injury to the Plaintiffs because this information was not in the public market place when the class period ended.

Absent revelation to the purchasing market of the information that would later be detailed in the FERC and IPUC orders, Plaintiffs rely on broader, and, in the Court's view, more nebulous causal connections between the price decline on June 2, 2002, and the yet unrevealed misrepresentations and omissions. Plaintiffs allege in paragraph 8 and 10 of the consolidated complaint that "knowing their manipulations could not continue under increased government scrutiny, defendants abruptly announced on April 12, 2002, that they were drastically reducing Idacorp's 2002 earnings...," and this also led to the final earning warning in June of 2002. *Dura* requires the Plaintiffs to give notice of the causal connection and the Plaintiffs have alleged no *facts* in support of their claims that some "government scrutiny" explains the causal connection between that loss and the misrepresentations. *Dura*, 125 S.Ct. at 1634 ("And the complaint nowhere else provides the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation concerning Dura's 'spray device.' ").

In an attempt to salvage this deficiency, Plaintiffs argue that it was the final disclosure of the lack of creditworthy counterparties that caused the stock value to fall. But this disclosure in April or June of 2002 could not have been causal connection which led to the fall of the stock on those dates because, at the very beginning of the class period, Idacorp advised the analysts during the February 1 conference call that deteriorating credit conditions were limiting its ability

**Report and Recommendation - Page 14**

to transact with many counterparties.  This warning was again made in the April 12 and  25, 2002, press releases (that IE's projected earnings were declining because of fewer creditworthy counterparties in the market).   Contrary to Plaintiffs' assertion, there was no sudden revelation of this misrepresentation at the end of the class period, because the same statements had been made at the beginning of the class period.[2]

In this regard, the facts of this case are similar to the Second Circuit's decision in *Lentell v. Merrill Lynch & Co. Inc.,* 396 F.3d 161 (2d Cir. 2005).  In that case, plaintiffs alleged that Merrill and its research analysts issued false and misleading reports recommending that investors purchase share in various  companies, even though the analysts did not then believe that those companies were a good investment.  It was alleged that the analysts were touting the investment quality of these companies in an effort to cultivate Merrill's investment banking clients.  The New York Attorney General started an investigation into the investment recommendations and sought a state court order compelling production of documents, testimony and other evidence.  A supporting affidavit outlined the scheme to publish bogus analysis in an effort to generate investment banking business.  Once the investigation was announced, 140 class-action complaints were filed which were later consolidated.  *Id.* at 163-164.

The Second Circuit affirmed the dismissal of the action on the ground that the complaints failed to plead that the alleged misrepresentations and omissions caused the claimed losses.  As the court noted:

---

[2]   The primary, if not sole, claim that IE was dealing with energy partners that were not creditworthy relates to the Overton contract.  That contract was for providing power over ten years and IE projected a $73 million return over the length of the contract.  Before the class period started, Idacorp announced that Overton had defaulted on the contract and that suit had been filed.  The litigation was settled and Idacorp took a $21.5 million charge off against earnings in 2003 as a result.

**Report and Recommendation - Page 15**

> Plaintiffs allege that when they invested, they were relying on the integrity of the market (including the fraudulent recommendations and omissions made by Merrill Lynch during the putative class periods), that the shares plummeted, and that their investments became virtually worthless.  To plead loss causation, the complaints must allege facts that support an inference that Merrill's misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud.
> 
>    *   *   *
> 
> As noted, to establish loss causation, 'a  plaintiff must allege...that the *subject* of  the fraudulent statement or omission was the cause of the actual loss suffered.'

*Id.* at 174-175 (emphasis supplied)(internal citations omitted).

  The Second Circuit went on to note that the fraudulent recommendation on the reports issued by Merrill also contained information advising investors that they were dealing with volatile investment and therefore subject to devaluation risk.  In order to plead successfully, plaintiffs were required to establish the that Merrill's misstatements and omissions concealed the price-volatility risk or some other risk that materialized and played a part in diminishing the market value.  *Id.* at 176-177.

  In this case, the risk that Plaintiffs state was concealed, the volatility of the share value based on dealing with or the lack of creditworthy counterparties, was disclosed before (Overton) and throughout the class period and thus were not concealed.  (Press Release, April 12, 2002, "A key driver to the decrease is attributable to the fact that IDACORP Energy's results are being negatively impacted by...fewer creditworthy counterparties in the markets today")  As the court in *Lentell* found:

> But where (as here) substantial indicia of the risk that materialized are unambiguously apparent on the face of the disclosure alleged to conceal the very same risk, a plaintiff must allege (I) facts

**Report and Recommendation - Page 16**

>sufficient to support an inference that it was defendant's fraud–rather than other salient factors–that proximately caused plaintiff's loss; or (ii) facts sufficient to apportion the losses between the disclosed and concealed portions of the risk that ultimately destroyed an investment.  Plaintiffs have done neither, and thus offer no factual basis to support the allegation that Merrill's misrepresentations and omissions caused the losses flowing from the well-disclosed volatility of securities issued by 24/7 Media and Interliant.

*Id.* at 177.

## IV.
## CONCLUSION.

In conclusion, the Court finds that the Plaintiffs have not satisfactorily pled loss causation for the reasons outline above.  Because this is an essential element to Plaintiffs' causes of action, it is not necessary for the Court to address the other grounds advanced by the Defendants for dismissal.  Oftentimes if a complaint is deemed to be insufficient under Fed. R. Civ. P. 12(b)(6), a party is afforded an opportunity to file an amended complaint to address the deficiencies.  However, in this case, and based on the record before the Court, it does not appear that Plaintiffs could cure the deficiencies outlined above and that it would be futile to allow an amendment under Fed. R. Civ. P. 15.  The Court therefore recommends that the motion to dismiss be granted and that the case be dismissed.

\ \ \

\ \ \

\ \ \

## RECOMMENDATION

Based upon the foregoing, the Court being otherwise fully advised in the premises, the Court **hereby RECOMMENDS that:**

1) Defendants' motion to dismiss (docket # 56), filed February 9, 2005, be GRANTED.

2) Written objections, if any, to this Report and Recommendation must be filed **no later than WEDNESDAY, SEPTEMBER 21, 2005,** or as a result of failing to do so, that party may waive the right to raise factual and/or legal objections to the United States Court of Appeals for the Ninth Circuit.

3) Written replies, if any to the objections to this Report and Recommendation must be filed **no later than MONDAY, SEPTEMBER 26, 2005.**

DATED: September 14, 2005

_____
Honorable Mikel H. Williams
United States Magistrate Judge

**Report and Recommendation - Page 18**